Sausalito v. O'Neill Good morning, Your Honors. My name is Stephen Volcker. If it pleases the Court, I represent Appellant City of Sausalito in this appeal. The appeal presents a number of vital issues to implementation of this nation's foremost environmental statutes. Among the issues are whether the city has standing to enforce the Coastal Zone Management Act, the Endangered Species Act, the Marine Mammal Protection Act, the governing the discretion of the National Park Service to manage lands entrusted to its jurisdiction. In addition, we have a number of substantive issues presented governing the Park Service's compliance with the National Environmental Policy Act and the statutes that I've enumerated. In the trial proceedings, the district court found that the Park Service had waived objection to the city's standing to bring this action under the Endangered Species Act, NEPA, and the Park Service Organic Act, but found that Sausalito lacked standing under the other statutes. And if it pleases the Court, I will first address the Park Service. With respect to the standing issues, the Park Service contends on appeal that the city lacks standing under the Endangered Species Act. This action, however, was brought under the citizen suit provision of the Endangered Species Act. And under this Court's ruling in Southwest Biological Diversity Center, a citizen suit action is not subject to the zone of interest prudential standing test, as would be the case if the claim were brought under the Administrative Procedure Act. Therefore, there can be no zone of interest defense to the city standing under the Endangered Species Act. And is the city a citizen for purposes of that statute? Yes, Your Honor. In addition Yes, Your Honor. With a citation or without a citation? Yes. I would have to turn to the statutory definition of party under that act. I do recall that there are cases, for example, there's a city is a party within the meaning of a citizen suit provision under the Clean Air Act. And I believe that there is authority also under the Clean Water Act. The citizen suit provisions of all three acts, the Clean Water Act, the Clean Air Act, and the Endangered Species Act are virtually identical. And I believe that the definition in one is that the city is a citizen for purposes of that act. And thus, the authority that we have under the other statutes would control here. What's the constitutional standing for the Endangered Species Act? The claim, I gather, is moving. Yes. The endangered species were the butterfly and the salmon. Yes. Thank you, Judge Canby. There are three tests under the question whether there's a constitutional standing or Article III standing. The first is whether there is an injury in fact. The second is whether there is a nexus between that injury and the statutory protection sought to be enforced. And the third is whether or not the wrong is redressable. Right. So it's probably the first that I'm thinking of. Yes. With regard to the first issue, the record shows that two things that are pertinent to this question. First, there are mission blue butterflies within the city of Sausalito. Its general plan indeed specifically enjoins the city to protect their habitat. Secondly, there is within the record a number of studies prepared under contract with the National Park Service and other jurisdictions which conclude that the principal reason that mission blue butterflies have become endangered and are likely to become extinct in the future is habitat fragmentation and reduction in the size of the remaining refugia. That is, the larger the contiguous area protected from development, the greater the likelihood that the species will survive everywhere. Okay. And is there any connection between the butterflies in Sausalito and the butterflies in Fort Baker? Yes, Your Honor. The record shows that Fort Baker is adjacent to Sausalito, and the lands identified in Sausalito's general plan as comprising mission blue butterfly habitat are along Wolfback Ridge, which is the northern and eastern boundary with the Fort Baker. Okay. You know, 20 minutes is a longer time than the 10 minutes, but it's still pretty short. So rather than let you argue hoping to hit what our questions might be, let me just ask one of the questions that is discreet, may not take very long to answer, and that's with respect to the Marine Mammal Protection Act. Yes. You argue that the city has standing to sue, to require an application for a permit, because I gather no permit has been applied for that would allow the, quote, taking, which is kind of an odd word for harassing or bothering these marine mammals. There's a case called Strahan in the First Circuit, which none of you cited, that holds that there's standing, once a permit is applied for, for an, quote, interested party to intervene in the hearing and to say that the permit should not be granted. The First Circuit case, Strahan, however, says that if no permit is applied for, it is within the exclusive jurisdiction of the secretary to enforce the act. Do you have any response to that? They say no private party has the ability to bring suit to require that there be an application for the permit. I regret that I have not addressed it in the brief. I am not aware of that authority. I would question the authority on several grounds, Your Honor, and if I might explain why. First of all, such a ruling would permit the government, indeed, to carry out actions which would harm the species in question without an application ever having been filed, and the protections that the act provides through the permit review process having been ignored. We have a number of laws, environmental laws that recognize standing to challenge agency action where required permits have not been obtained, for example, under the Clean Water Act if a discharger is discharging from a point source and lacks a permit, then the courts acknowledge, of course, the standing of individuals to seek redress to compel a permit process to begin. And in this case, we believe that the environmental impact statement should have addressed the need for the permit. Okay. Now, let me say this, then, just because I want to make sure we're not cheating on time from other issues. The other side will certainly have a chance to respond to that. I suspect they're in the same position as you, who have not read that First Circuit case, and if we need further briefing, we will certainly ask for it. The central question for me, I'm not sure for my colleagues, is under NEPA. And the central question for me is whether or not the Park Service should, as one of its reasonable alternatives, investigated the possibility of congressional funding, which would have allowed them either not to have this hotel and conference center at all, or to have it at the size that the city of Sausalito has been consistently willing to accept, which is about 150 rooms, compared to what the EIS says is the impact that they're evaluating. Why should that have been investigated as a reasonable alternative? I think that the Park Service routinely requests funding for management of the hundreds of units entrusted to its management. It is not an extraordinary act. It is, in fact, the bread and butter of the Park Service's preparation of its annual budget proposals to Congress and Congress's review of those. We have a number of cases, most notably this Court's recent decision in the Muckleshoot case, where courts have said that NEPA is intended in part to inform Congress as to the reasonable range of alternative management schemes, and it may fall to Congress to appropriate additional funds to carry out those options. Now, to the extent that — I mean, obviously, Muckleshoot is the decision of our Court, and to the extent that whatever it means, it is controlling on us. I note, however, that in Muckleshoot, the requirement that application for funds be made as investigated as one of reasonable alternatives, it was application for money out of an existing fund rather than application from Congress to appropriate new funding. Is that a relevant difference here? I don't believe so because the funding available to the Park does include sort of earmarked funds as well as general appropriation funds, and there's been no suggestion that the Park was unable to apply for funds under both avenues. But it's really a distinction without a difference in any event, Your Honor, because the annual appropriation process identifies management proposals and the likely cost of them, and in evaluating those management proposals, Congress needs to know the costs and what are the environmental costs and the economic costs. Congress was deprived of that information necessary for an informed decision. Also, Your Honor, in this case, we have an even stronger statutory injunction to the federal managing agency to protect environmental resources. This Court commented in deciding the Muckleshoot case that it seemed odd that the Forest Service had failed to give the fullest consideration possible, which was NEPA's injunction, fullest extent possible to management that would be more consistent with its organic act, which is to manage forests to protect resource values, watershed values, to maintain multiple uses of the forests. In this case, under the bicycle trails decision of this Court, we know that Congress has on repeated occasions clarified that recreation areas are to be managed for the fundamental purpose of resource protection. That's from the legislative history. It's from this Court's own rulings. It's also true that the statutes, the Golden Gate National Recreation Area Direct, that the Park Service shall preserve the recreation area as far as possible. Counsel, granted that that broad aspirational goal is contained in the organic act, but does it make a difference here where the Department of Defense has deeded a former military base to the National Park Service with, I guess, almost 100 or more buildings that are in various states of disrepair? Is it the city's position that what the NPS should have considered here was just tearing down all these buildings and restoring Fort Baker to its natural habitat? Is that where you're going with this argument? No, Your Honor. Congress was aware of the military installations when it created the Golden Gate National Recreation Area, and the legislation requires protection and restoration of both the natural and the historic structures. The city's position is that those two objectives are not hostile. One can restore those historic structures that the scientists and historians believe merit that protection, at the same time that the natural attributes of the area can be restored. In this case, developing what would be Marin County's largest hotel complex, which would involve the creation of at least 895 parking spaces, a daily visitor population of 2,700 people at most, is not necessary for restoration of historic structures and impedes directly protection and restoration of the natural amenities of the area. This requirement that was written in on revenue producing, is there any statutory mandate toward revenue producing activities in Fort Baker? I'm not aware of any. None has been cited by the National Park Service, Your Honor. And indeed, that is an excellent question, because if that were the case, then we would have a conflict in the statutory direction to the Park Service, which perhaps would provide some justification for a narrowing, perhaps, of the Park Service's duty under NEPA to examine a reasonable range of alternatives. But absent such a conflict, it seems clear under all the cases that have examined what is a reasonable range of alternatives under NEPA, for example, the California B Block case of this court held that where the U.S. Forest Service had examined a number of options for managing roadless areas, but had assumed that all should be roaded at least to the extent of 37% of their lands, that that narrowing of the management options failed to satisfy NEPA's direction that to the fullest extent possible, the agency consider a reasonable range of alternatives so you could balance environmental protection with resource development. And in this case, the Park Service simply declined to examine any alternative that would not develop Fort Baker's 330 acres with very substantial urban uses. And the sole justification for this undue narrowing or preemptive narrowing of its consideration of alternatives was its assumption that it had to develop uses that were economically self-sufficient. But the city changed its position. I thought your objection before the district court was that you wanted a smaller conference center that would be more accessible by nonprofit and other groups who wouldn't necessarily be able to pay market rates in the Bay Area for conference centers. That was not the position before the district court, Your Honor. Before the district court, the same arguments under NEPA and the other statutes that I've articulated and am articulating right now were made to the district court. Then maybe it's in the record of decision, but I thought in reviewing the materials for the argument today that the city at one point was essentially arguing not against the development of a conference center, but they simply wanted a smaller one, 157 bed as opposed to 300 plus. Did I misread the record? The city of Sausalito sought to reduce the impacts of this conference center, and in comments before the Park Service approved this project, asked the park to consider limiting the number of rooms to 150. More importantly, that was premised on the city's request that the park not build additional structures which would intrude on the open space of the area. The city commented, comments by other members of the public, that likewise asked the Park Service to reconsider its fundamental assumption that it had to develop this area on an economically self-sufficient basis. The Marine Audubon Society, for example, and others directly challenged that assumption and asked, I'm just trying to figure out whether the city has shifted positions here, because I thought I understood from my review of the record that the city was okay with a limited development, as you said, 150 bed facility, but I thought I heard you arguing now that the city doesn't want the management center at all. Is that true? I think what the city wants, Your Honor, is compliance with NEPA, and a NEPA analysis would Not my question. My question is, has the city shifted its litigating position? No. Okay. Absolutely not. So a management center or conference center of some sort would be acceptable as long as it's on a small scale and doesn't involve new construction. That's not the city's position. That has never been its litigating position. What is the city's position? That if the Park Service examined a reasonable range of alternatives, and if it found that for economic reasons it needed to request additional funding from Congress, that it would do that, that it would make that request to Congress, so as necessary to assure that development would not unnecessarily harm the environment. That is to say, the city says, we want you to make a request to Congress so that there's no hotel and conference center, or make a request to conference so that the hotel and conference center will only be 150 rooms. There's letter after letter in the record in which the city of Sausalito says, it has never been our position and is not our position now to oppose a conference center of 150 beds. And are you now saying that the city of Sausalito's position here and in the district court is that they wanted no conference center so long as sufficient funds could be gathered to accommodate restoration of the historic buildings? I have articulated what I believe to be the city's consistent litigation position, Your Honor. Which is? No conference center so long as sufficient funds can be obtained? There should not be an approval for this project until there's been compliance with NEPA. And that if Congress were informed, Congress could provide further direction as to whether it's willing to expend funds in order to provide for rehabilitation of structures as necessary. Bear in mind that in 1999, the same year that the final EIS determined that there were fiscal limitations, the park had requested and obtained from Congress $5.5 million to restore historic structures on Alcatraz Island, within the GTNRA. There is nothing in this record suggesting that the park- Let me do this, if I may. You've run over by about two minutes. This is a difficult and complicated case with many issues. What I'd like to do is have you stop now, hear from the other side, but allow you some time for rebuttal. Thank you, Your Honor. Thank you. Good morning, Your Honors. May it please the Court. John Smeltzer for the National Park Service and the other Federal appellees. Your Honor, where I'd like to start is with the question where we left off, is the issue of NEPA and the reasonable range of alternatives, and then move to the standing questions. I'd like to hear your answer to my question to your opponent. Has the city changed position here? I'm still confused as to what they said on the record and what they're saying now as to what alternatives are acceptable. Yes, Your Honor. It seems to us the city has absolutely changed its position. In the administrative process, as the Park Service was working through the alternatives that were available and that were to be studied for Fort Baker, they put forward the proposed plan, the preferred plan was the retreat and conference center. The city consistently said we're happy with that as a concept, but we want you to work with it in terms of its scale, its size, and the impact that it will have. And did the Department of the Interior agree to the scaled-down version? I thought there was some suggestion in Judge LaPorte's decision that it had. In a fashion, Your Honor. Not exactly what the city had sought. In a non-enforceable fashion? Well, let me put it this way. Maybe, if we like to, in fashion. Contractor's option. The city asked for lots of different things, Your Honor. A lot of the things they asked for were to mitigate impacts from traffic that would be generated from a facility this size. We have essentially met all of their concerns in terms of traffic and are working together on a traffic plan, and have worked together on traffic concerns. As to just the size of it itself, separate from any impacts that it might have, what the city asked for, and again in the letters that were in the record, was we want a cap. We want you to say that you're not going to build bigger than 150 or you're not going to build bigger than 250. The number actually changed a couple times. In response to that, what the Park Service said was we designed this alternative to achieve certain project goals, this particular retreat and conference center alternative. One of those goals, well, the program goals and the other goal is the financial sustainability goal, which they have addressed. And what the Park Service wanted to study as part of the NEPA analysis was a plan that would be feasible, that would be able to meet these various objectives. And so what we agreed to do with the city in terms of the overall size was put in a mitigation factor that we would commit to build into the competitive bid selection process a criteria that said we would select the smallest economic, the smallest possible economically feasible retreat and conference center. And what that means is. And if that turns out to be 350, so be it. That's true, Your Honor. Absolutely. So I think we're supposed to evaluate this proposal as if there is a possibility of 350. There's certainly no guarantee of less. We have never argued otherwise, but we do say in response to the city's position that we did try to meet those concerns. Let me ask you a different question. Why haven't you gone to Congress asking for money to subsidize this if that's what it requires to keep it down to 150 beds, 150 rooms? Well, I think the quickest answer to your question, Your Honor, is that there's no duty under NEPA. I didn't ask that. I said why haven't you? The Park Service does many things that it doesn't have a duty to do. Setting aside the legal duty, what the Park Service wanted to do was study the plans, figure out what plan they're going to do, and then you go to the Congress and you seek the appropriations. I mean, it's kind of putting the cart before the horse if you seek funding for every one of the proposals you're studying, you know, before you put them on the table and you see what you decide. But it would have been a very easy matter for you to go in the sense of putting an understandable proposal in front of Congress to say we would like sufficient funds to keep the planned conference and hotel center down to 150 rooms, and if Congress can commit to that, we can then bid it out at that level. But you have not made such a request to Congress. Is that right? Well, no. I mean, we haven't made that specific request. And why not? It's not required. Well, it might be required under NEPA in the sense of investigating this as a reasonable alternative. Yes, Your Honor. So I have to know why you didn't do it. I mean, if you say it's impossible, they would never give us the money, therefore it's a ridiculous alternative, that's a good answer. Right. But that's not the answer. What other answer do you have as to why you didn't do it or why you do not anticipate doing it? Well, the shortest answer, Your Honor, is the 350-room conference center that was fully evaluated in the environmental impact statement will have no significant adverse impacts on the environment. Well, that's what you say. The city doesn't challenge that. Well, no, the city challenges that. The city says it will have an adverse impact in terms of the number of people coming in, and it will adversely affect in various ways. That's what the city says. As a matter of standing, Your Honor, they base their standing on this notion that it will cause congestion in the city of Sausalito. Yes. And there's some reason to think that more cars means more congestion. And more people means more cars. We did a traffic analysis at the city's request of intersections within the city of Sausalito to determine what effect the 350-room conference center plus the building in the Bay Area Discovery Museum and the other aspects of the plan were going to bring into downtown Sausalito. We did it working with the city at their request at the specific intersections they wanted us to study. We did that study. We determined that there would be a less than 4 percent increase in traffic. So there's an increase in traffic. Okay. But we said it's an insignificant effect. And, Your Honor, that's what you're saying. They don't challenge that in this lawsuit. They're not bringing a claim saying we used the wrong methodology to evaluate the traffic. They're not saying we failed to show the right impact of traffic on the city of Sausalito. But they're saying we don't want this increase in traffic. They are saying that. Well, sure. From a standing perspective, and we don't say they don't have standing under NEPA, what I'm saying is in terms of evaluating alternatives to a retreat and conference center, what the case law says under Muckleshoot and the other cases is an agency can't just willy-nilly say we're not going to study an alternative that's deemed environmentally friendly or if there's a possibility of getting funding. Okay. But there are two different questions, it seems to me, that might go on here. There's one question as to what might give the city of Sausalito standing. And I think I've heard a concession, and you've never argued to the contrary, that the increased traffic gives them standing to bring the lawsuit. On the other hand, as you're doing EIS, you're required to investigate all reasonable alternatives that might have environmental impacts. And I don't think you're saying that the difference between 150 rooms and 350 rooms has only one possible adverse environmental impact, and that's traffic in Sausalito. It will have other – obviously, you've got more people in the area. You've got more people doing things which may have various impacts. So the fact that we have traffic is not the only thing as to which it might be relevant how large this is. Your Honor, clearly, as a matter of common sense, if you have a bigger facility, it's going to bring more people in. I only ask the Court to consider this point. Sausalito doesn't allege visitor impact problems. They don't allege the environmental claims that they raise with respect to the mission blue butterfly, the salmon, birds, marine mammals. None of those relate to the size of the retreat and conference center. Those are all related to different elements of the plan. And if you look at the – of all the alternatives that were considered, all the alternatives that were developed in the scoping process that the public put out there that were considered, this alternative, what we want to get across to the Court, was chosen as the alternative that would have the least impact on the environment and would do the most for resource protection. And just saying, you know, because it's bigger as opposed to smaller. No, you can't quite say that. That is to say the least impact on the national environment, if we're talking butterflies and various things, is close the doors, let no one in, let it go to ruin and the mission butterflies can have the whole place. I mean, you've clearly not chosen the least impact on the environment. It's entirely possible that the impact on the environment that this project will have is entirely acceptable. But you've not chosen that which has the least impact on the environment. Your Honor, the record shows that this was the environmentally preferred alternative. This, with respect to mission blue butterflies, this alternative – let me step back. The Retreat and Conference Center is in an area of Fort Baker that is already developed. The size of the construction at the Retreat and Conference Center, even to the 350 rooms, will not impact natural habitat for mission blue butterfly or any other species. I understand the position. Let me ask you a different question. Under the Coastal Zone Management Act, you are required to coordinate and get a declaration of consistency from the commission. Yes, Your Honor. And that commission voted 18-0 that it was consistent. Yes, Your Honor. The project that you described to them had an additional 30,000, I believe, in your letter, square feet of construction. The letter in which they respond, we think it's consistent, says 20,000. I'm not sure how they moved from 30, which was in your letter, to 20 in their letter. But, in fact, the final EIS talks about 85,000 additional square feet of construction. How can I regard that statement of consistency as consistent with the EIS as finally applied when the square footage of new construction is so different? Your Honor, you've caught me a little bit off guard in the sense that this wasn't something that was raised. Well, I've said. I appreciate that. I'm reading the record. I see those numbers, and I say, what's going on here? I appreciate that, Your Honor. And all I can say is it was my understanding that we fully communicated to the Bay Conservation and Development Commission, BCDC, the inaccurate description of the project we were going to construct. And if we didn't, I'm sure the city would have raised it with all the other things. Well, the city has missed a few things. They've got a lot of things, and they missed a few things. Let me ask you a different question. There's something in the record that I'm not quite sure how to evaluate, and it's two press releases from Congresswoman Lynn Woolsey. One of them says that she has obtained $6 million for refurbishment or maintenance of structures in Fort Baker. And it's just a press release. Now, press releases, you know, they say all kinds of stuff. Did she, in fact, obtain $6 million from Congress for rehabilitation or maintenance of buildings in Fort Baker? I'm certain that she was correct in that statement. I don't know which statement you're referring to. Well, there's a press release in the record. It's not inconsistent with what we've been saying. There are historic buildings at Fort Baker that are places away from the parade ground. There are historic buildings on the waterfront. There are historic buildings in other places. And we never said, we've never said that this project and the revenues that are going to be developed through the lease is going to cover all historic preservation. And we have sought, the Park Service has sought funding from Congress to do historic rehabilitation at Fort Baker, and that's part of this plan. We're going to be relying on Congress for money to do natural resources protection and historic preservation. Well, then the question comes up, why does not the EIS discuss, we decided not to ask Congress for money that we think is going to come from this conference center? I mean, you don't necessarily have to get the money. You don't even necessarily have to ask to get the money. But maybe you have to say why you're not asking to get the money. Well, the first point, Your Honor, to make is that the city worked with members of Congress in terms of designing this, and specifically about the goal of financial sustainability and being able to retain lease revenues. And it's in the record that Congress in the Appropriations Act in 1998 and again in 2003 specifically included a provision for Fort Baker that says the Park Service may lease, may pursue leases, and may retain revenue from lease for the purposes of historic preservation. In the scoping statement, in the environmental impact statement, it's clear that this project was fully developed in cooperation with Congress, in talking to Congress to vet out this particular option. And so it's a misrepresentation to suggest that we didn't give Congress the opportunity to fund this. We were talking, the Park Service was talking to the congressional reps, the people in the area, about what would be best. What is the best? Although I have to say, giving Congress the opportunity to fund things, this may be an imprecise analogy, Congress has had the opportunity to give Federal judges additional money for salaries for a very long time. And giving Congress the opportunity to do something is something different from asking or even lobbying Congress to do it. And I'm asking you, why don't you have in the EIS the option of affirmatively asking Congress, instead of presenting them the opportunity that if they like, maybe someday they might give you some money? Because we thought the goal of financial sustainability was a good one, and because it doesn't make a meaningful difference in terms of the environmental impacts here. And let me first address the goal of financial sustainability. What we're not saying is, again, that we're not going to Congress and we're going to need funds from Congress. The Park Service obviously is going to need funds from Congress. The point is, in terms of financial sustainability, if you can get a use in a building that's perfectly consistent with Park Service objectives, programs for the Park Service and is consistent with the historic values, that can also bring in some revenue that will help in the short term restore those buildings and that will also help in the long term, I mean, for years to come, bring in revenue that's used to maintain those buildings, that is a good thing. And that's what the Park Service said. That is a good goal because that's a better, more stable source of revenue than running back to Congress all the time and seeking funds. And obviously the Park Service is going to have to seek funds, but what they came to a decision is, like you said, if you can get this kind of use in that building that will serve this purpose and also the other objectives of the plan, it's a good idea. And so that's what the Park Service did. And then in terms of the environmental impacts, again, Your Honor, Citi doesn't contend that this won't preserve the historic resources. They also don't contend that the retreat and conference center, the specific retreat and conference center and the 350-room center is going to have specific environmental impacts on Mission Blue Butterfly, on salmon, on migratory birds. None of the issues that they've raised relate specifically to the size of the retreat and conference center. What they just keep saying is it's too big. It's beyond the scale of this site. But if you look at the historic preservation review that was done as part of this EIS, it determined that the new construction that will occur in the historic playground and in the Cape Heart, the adjoining area, is perfectly consistent with the scale of the urbanization that's already there, doesn't interfere with the historic values, and won't cause any adverse impacts. As I understand it, the project that would turn this into, in part, a hotel and conference center will require the construction of three new buildings. And I'm not sure that I've seen whether the buildings will be any larger or any smaller based upon how many rooms there are. That is to say, I gather that what these new buildings are for is for the actual meeting rooms and for the restaurant or various things. So I'm not sure. Is there anywhere in the record or in the EIS that tells me that these buildings would have a different footprint depending on how many rooms there are? Let me answer that. The actual number of rooms will depend on the competitive selection process. I understand that, yeah. In terms of the historic parade ground, there are two new buildings that are already there. There's a small one back behind. One is a dining facility. One is a meeting center, both built to 120,000 square feet, 1,000 square feet, both built to the scale of the existing buildings to design standards that will fit in. Behind that area, there's this Capehart residential area where there's already a bunch of housing and different buildings. This particular proposal says that depending on how the bid selection works out, that those buildings will either be rehabilitated for rooms or they'll be replaced with new buildings for rooms. But the exact number is not in the record. Your Honor, maybe if I could turn quickly to some of the standing questions that were raised. First of all, with respect to the Environmental or the Endangered Species Act, we don't argue prudential concerns here. It's simply constitutional concerns. Let me make sure I understand. That is to say, if we find that there is Article III constitutional standing, you concede that the statute grants standing to the city? Well, yes, Your Honor. Okay. And with respect to constitutional standing, what we're asking the Court to do is that for any claim that you claim violates a particular statute, what you have to do is say, does this particular element of the plan that violates the ESA or the MMPA or the MBTA, does this particular thing cause a particularized injury that this Court can redress? What we're asking the Court to recognize is that all of the claims, for example, relating to the Mission Blue Butterfly relate to a single parking lot that's alleged to encroach upon butterfly habitat. That parking lot is going to be built for the Bay Area Discovery Museum. Separate parking is provided for the retreat and conference center. The city doesn't object to the Bay Area Discovery Museum going in. They have preserved an objection to the parking lot. But the point is ---- I don't think that's a standing issue. That sounds like a merits issue. You're saying, listen, whatever we're doing doesn't in any way violate the substantive standards of the Act. No. What we're saying is that parking lot, because it's not related to the retreat and conference center, it cannot ---- they can't claim standing on that based on the congestion that's going to be caused in the city, because the location of one parking lot can't cause that injury. Let me ask you this. Why is, for purposes of Article III standing, parking or congestion within the city the only basis upon which the city can assert standing? It's not, Your Honor. And with respect to the Mission Blue Butterfly, what the city claims is we've got butterflies in the city, we have public lands that we have to manage. But I ask the Court to look at the record. They have not established that either in the declarations of Dana Whitson that were put into the record or in the other materials that were presented. In the city ---- Is the city not allowed to have generalized environmental concerns under the ESA similar to, say, mine? I mean, I like to walk around in Fort Baker, let's say. Is the city not allowed to say, well, you know, environmental concerns are under the statute. Clearly, we've been authorized. You've just conceded that the city has been authorized under ESA. Not under the precedence of this Court, Your Honor. This Court has clearly established that for a municipality to have a standing, they can't invoke the aesthetic or, you know, the environmental concerns. I'd like to look at butterflies. Is that how you read the City of Davis case? The City of Davis case, yes, absolutely. That particular issue wasn't raised. But in the City of Davis, what they were talking about is an interchange that was going to be built right next to the City of Davis that was going to bring all kinds of development that was going to affect the planning. The planning. And they have not alleged otherwise. One last question before, I mean, the time is run, but one last question, and that is on the Marine Mammal Protection Act. I asked your adversary about the Strayan case from the First Circuit, which is cited in neither of your two briefs. My guess is that you're not prepared to address it. That's correct. Okay. Thank you. Rebuttal? Why don't we try two or three minutes? Thank you, Your Honor. First, in response to Your Honor's question about the definition of person for purposes of standing under the citizen supervision of the Endangered Species Act, the relevant statute is 16 U.S.C. Section 1532.13, which defines a person to include a municipality. I understand that the government has conceded the point in any event. Okay. With respect to new construction, Your Honor, the EIS at Excerpts of Record Volume 3, page 1376 shows that 156,000 square feet of new construction is proposed, of which 99,000 would be in a new hotel. I'm sorry. Back me up. I've got all the stuff here. What page am I looking at? Tab 3, page 1376. Tab 3 of 1376. Okay. I'm with you. There was some question that Your Honor raised about the size of the new structure. Okay. I'm on this page now. You're telling me how much new construction is there? There's 156,000 square feet of new construction. Where do I see that on this page? I'm on page FB001376 at tab 3. Are we on the same page? Or whatever page it is, just make sure I'm on the right one. Yes, Your Honor. Your Honor, you have to add some of the different figures that appear on this page, including the 99,000 square foot hotel to derive that total new construction figure. Now, the big number there is the Cape Heart area of 99,000. Is that new construction that will replace existing buildings? That's my understanding, Your Honor. I see. So the footprint of 99,000 is not a different footprint from existing buildings. It's new buildings, but new buildings replacing existing buildings? There is a net increase of 85,000 square feet indicated in the lower right of all structures. Right. I understand that. And that number is even stated in the text of the FEIS. Yes. Right. The government suggested that the EIS adequately addressed traffic impacts and that the city accepts that. That's not so. The EIS dramatically understated traffic impacts. For example, it stated that the project would not cause a significant adverse impact on traffic and circulation, yet the tables within the EIS show increases of 300 and 400 percent on streets, such as Bunker Road, Alexander, and East Road within the park boundaries. The government indicated that there was direction from Congress that the park had permission to lease some facilities. We're running over the rebuttal time. If you can sum up in about 30 seconds, I'd appreciate it. Yes. I think City of Davis is defaulting. Before you sum up, let me ask one question. It relates back to standing on the things like the Marine Mammal Protection Act and the Coastal Zone Management Act and the Organic Act and so on, the things that you were found not to have standing on. What is the city's zone of interest in those? I mean, is it just traffic? The city's zone of interest includes marine mammals, which occupy the city's shoreline. Does moving marine mammals out some distance from Cove and Fort Baker have any effect on marine mammals in Sausalito? According to the declaration of the city's city manager, who has 30 years' experience studying environmental impacts, yes, it would. It would make it less likely that marine mammals would occupy that area. Also, that area is immediately adjacent to Sausalito and visible to Sausalito. Many of the species that issue— Now, does Sausalito—is this the kind of an interest Sausalito can have? I mean, Sausalito doesn't look at marine mammals. The people in Sausalito look at marine mammals. Yes, I believe because part of the city's general planning function is to provide for visitor use of its city-owned marina, of its parks, of its streets, and other public areas. The city drives revenue from the tourist industry, which enjoys the rustic, natural character of the area, including the abundant wildlife along the shoreline, the fact that there is an active sport fishing industry in the area, which would be harmed if juvenile salmonids are reduced in numbers due to the development of— These are somewhere in your allegations or your declarations. Yes, Your Honor. Okay. And to finally sum up, I mean, overall what we have here is a dramatic increase in visitor usage, a more than doubling of existing usage, which would, according to unrefuted testimony in the record, cause crowding both at the site and on adjacent streets. It would increase air pollution, noise, traffic congestion. It would harm wildlife. It would pave over a designated Mission Blue Butterfly site. And those impacts, I think, give the city standing and confirm that approval of this project violated those statutes. Thank you. Thank you very much. A difficult case and a useful argument on both sides. The case of Sausalito v. O'Neill is now submitted, and we will be in recess until tomorrow morning. All rise. The court for this session stands adjourned.
judges: Canby, W. Fletcher, Tallman